IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
March 14, 2006 Session

## STATE OF TENNESSEE v. SHIRLEY PETERS

**Direct Appeal from the Circuit Court for Coffee County**
**No. 4160     John W. Rollins, Judge**

_____

**No. M2005-01859-CCA-R3-CD - Filed September 19, 2006**

_____

The defendant, Shirley Peters (Pettit), pled guilty to reckless homicide (Class D Felony) and agreed to a sentence of eight years as a Range II, multiple offender. The manner of service of the sentence was to be determined following a sentencing hearing. On July 11, 2005, the trial court ordered the defendant to serve her sentence in confinement and denied any alternative sentence. The defendant contends on appeal that the trial court erred in (1) overruling her motion for deferred judgment and (2) requiring confinement when she is eligible for alternative sentencing. We conclude that the defendant has not carried her burden of showing that the sentence imposed is improper, and we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Michael D. Galligan and John P. Partin, McMinnville, Tennessee, for the appellant, Shirley Peters.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Charles Michael Layne, District Attorney General; and Kenneth J. Shelton, Jr. and Jason Ponder, Assistant District Attorneys General, for the appellant, Shirley Peters.

### OPINION

Facts and Procedural History

The defendant entered a plea of guilty to reckless homicide stemming from the death of her husband, the victim.

On August 27, 1999, the defendant and the victim engaged in a fight that ended in the death of the victim. The defendant admitted to law enforcement that she killed the victim after he slapped

her. She acknowledged that she retrieved a lead weight from an adjacent room in the home and used it to bludgeon the victim until he passed out. While the victim was unconscious, the defendant choked him until he expired. Her daughter then assisted her in loading the body into the victim's truck. The defendant drove the truck, with the body inside, to a remote location and attempted to set fire to the truck. She procured a piece of rope, dipped it into the gas tank of the truck, and lit it. She then left the scene and returned home to clean up the crime scene. The ensuing investigation was conducted by the Coffee County Sheriff's Department and the 14th Judicial District Attorney General's Office. Investigators received a phone call that the body had been discovered in a wooded area in Coffee County. Their investigation led them to the defendant's home and, after initially denying that she had any involvement in the death, she confessed.

The first witness to testify at the sentencing hearing was Officer Jerry Crabtree, Chief Deputy Sheriff for Coffee County. Officer Crabtree testified that he was at home on the day of the incident and was called to the scene. He stated that the body was found in the victim's truck which had been driven into the woods. The body, which was badly beaten around the head, was discovered in the cab of the truck. He further testified that they discovered a partially burned rope hanging from the gas tank of the truck. Later, Officer Crabtree left the scene and went to the defendant's residence with three other officers. He testified that the defendant stated that she had not seen her husband since the previous night when they had an argument and he had left in his truck. He stated that the defendant displayed no sign of emotion and did not ask any questions when they informed her that her husband was dead; she simply lit a cigarette and said, "Oh."

On cross-examination, Officer Crabtree testified that they discovered a purse in the truck that belonged to the defendant's daughter. He further testified that he saw the defendant's daughter later that day and that she looked disheveled but did not appear to have been in a fight because he did not notice any wounds.

Next, Doug Richardson, chief investigator with the Coffee County Sheriff's Department, testified that he was involved in the investigation of the incident. His testimony regarding the location of the truck and the victim's body were consistent with Officer Crabtree's testimony. He stated that he took the license plate information from the truck and confirmed that the truck belonged to the victim. He secured and processed the crime scene and then went to the defendant's home to conduct an interview. The defendant told him that she had argued with the victim the previous night and that he left in his truck after the argument. He further testified that the victim's wounds could not have been self-inflicted. While he was inside the defendant's home, he observed blood spatter and stains on the walls, and he told the defendant that it was obvious something had happened in the room. He read the defendant her Miranda rights but did not place her into custody. She then confessed and gave a statement to the officers that she and the victim had argued and that the victim slapped her during the argument. She stated that she retrieved a lead weight from another room and used it to kill him. Investigator Richardson further testified that he observed blood stains under a throw rug on the floor. They removed a sample of carpet, carpet pad, and sub-floor because they were all stained with blood. Finally, he stated that the defendant was calm and cooperative through the entire process and never showed any emotion.

On cross-examination, Investigator Richardson testified that they found a purse belonging to the defendant's daughter in the truck. He further testified that he saw the daughter at the jail later that day and that he observed some bruises on her. He testified that he saw bruises, bite marks, and cuts on the daughter's body while the defendant had only minor scratches and cuts. Finally, he testified that he had no knowledge of the defendant being in trouble previously.

The next witness was Investigator Billy Cook of the District Attorney's Office in the 14th Judicial District. He testified that he went to both the scene where the body was discovered and the defendant's home. When he interviewed the defendant at her home, she told him that the victim had a drinking problem and that the day of the incident was his birthday. The defendant's daughter had given the victim a bottle of whiskey for his birthday and fixed him two "stiff" drinks. He testified that the defendant also stated to him that she hit the victim with the weight and that he slapped her before she and her daughter attacked him. He said that she told Investigator Cook that the daughter took the victim's pulse after the beating and discovered he was still alive. The defendant then choked the victim until he died. He testified that the autopsy revealed the cause of death to be strangulation and blunt force trauma. He also stated that the bite marks and bruises on the daughter were consistent with her trying to hold the victim while the defendant beat him. During their interview, the defendant took several phone calls and told people that she had killed the victim. The defendant told him that they loaded the victim into his truck with great difficulty because of his weight and that she and her daughter drove the truck, with the victim inside, off the road into some trees, placed a rope into the gas tank, lit the rope, and then drove off.

On cross-examination, the investigator said that a fight and a murder took place on the night of the incident. He testified that there were injuries to the daughter's body. He again stated that the defendant claimed she choked the victim. He also testified that the defendant told him that the victim verbally abused her but did not physically abuse her.

The first witness called by the defense was Dr. Albert Brandon, the defendant's family physician for fifteen years and the Coffee County Coroner. He testified that the defendant suffers from a number of physical ailments including emphysema, arthritis, depression, and cluster migraines. He said that he never saw the defendant alone during her doctor's visits because the victim was always with her. He further stated that the books say there may be problems of abuse if a person's spouse is always with them. Finally, he testified that the defendant takes ten different medications on a daily basis for her ailments.

On cross-examination, Dr. Brandon testified that he diagnosed the defendant with emphysema ten years ago, but she continues to smoke. He said that she could be incarcerated without incident if she were allowed to continue her medication and that it would not be life-threatening for her to be in confinement.

On redirect examination, he testified that the defendant suffers from severe depression and post-traumatic stress disorder. On re-cross examination, he acknowledged that he had never treated the defendant for any kind of physical injury other than a car accident. He also agreed that there

could be reasons other than abuse for a spouse always being present. On further redirect, he stated that because the defendant was always with the victim, there would not have been an opportunity for the defendant to report any abuse. On further re-cross, he testified that the victim accompanied the defendant into the examination room but he never saw any physical signs of abuse on the defendant.

The next witness was Joan Pettit, the sister of the victim. She testified that she has known the defendant for twenty years and that, during that time, she has never seen her act violently. She claimed that the victim was "not a very nice person" and that he treated the defendant poorly. She said that the defendant is a very peaceful woman and, further, that she never saw her talk back or fight back with the victim. She also said that the defendant was not a danger to anyone and that all the victim did was hurt people in his life.

On cross-examination, the victim's sister testified that she is still sister-in-law to the defendant because the defendant has married the brother of the witness's husband since the murder of the victim. On redirect, she stated that her mother, also the victim's mother, blessed the defendant's new marriage because she was happy that the defendant found happiness.

Next, the niece of the victim, Tina Ham, testified that she had observed the victim be physically violent toward the defendant. She specifically recalled an incident when the victim slapped the defendant's back when he knew that she was experiencing back pain. She claimed that the defendant never talked back or fought back when the victim was ill with her. Finally, she stated that the defendant is not a danger to anyone.

On cross-examination, the victim's niece said that the defendant is an honest person. She agreed that if the defendant said she was not physically abused by the victim, it would be true. On redirect, she again claimed that she witnessed the victim slap the defendant and throw things at her to hurt her.

Next, Hicks Ramsey testified that the defendant had been employed by his mother as a home health care worker. He testified that the defendant dressed, bathed, cooked, and fed his mother. He said that the defendant was caring and compassionate with his mother and, further, that she is not a danger to the public.

The next witness, Kitty Shapard, testified that she is a mental health therapist and that she has treated the defendant for the last five years. She said that the defendant came into her care when she was hospitalized after a suicide attempt when the daughter involved in this incident was killed in a motor vehicle accident. She testified that she saw the defendant once each month. She stated that the defendant's first three husbands were physically, emotionally, and sexually abusive toward her and that the defendant's father taught her that a woman's job was to serve men. She diagnosed the defendant with post-traumatic stress disorder and major depression, but she focused her treatment on the post-traumatic stress disorder. She stated that the defendant was unable to recover from her history of abuse and, as a result, felt that others were more important in the world than she. She

believes that people in the defendant's position tend to behave like victims and that they expect to be victimized. She also testified that the defendant believed that she or a loved one was always in danger. She acknowledged that another doctor gave tests to the defendant that might indicate malingering behavior; however, she disagreed with that diagnosis because she had never seen any signs of malingering in the defendant. She stated that in her clinical opinion, the defendant "is not a violent person, never has been, and isn't likely to ever be." Further, she said that she did not believe the defendant to be a danger to society. She did say that if the defendant was sentenced to serve her sentence in confinement, her depression might return and she might try to either hurt herself or attempt suicide.

On cross-examination, she admitted that she did not administer any tests to the defendant and that no objective testing of the defendant has been done. She said that the chief forensic psychologist for Vanderbilt Medical Center indicated that the defendant has a pattern of exaggerating her mental symptoms. Finally, she testified that the defendant was in a "prison" in her marriage to the victim.

On redirect, Ms. Shepard claimed that her relationship with the defendant was totally professional. She also said that the longer she knows someone, she becomes more sure of their honesty and that, in her opinion, the defendant is not malingering. On re-cross, she agreed that if someone lies to themself long enough, he or she will begin to believe the lies.

Next, the defendant exercised her right to read a statement of allocution for the record and stated that she lived in constant fear. She claimed that she had been abused all of her life and that this was her only criminal act. She further stated that the argument started when the victim hit her two-year-old grandchild. She said that she lied to the police to protect her daughter because she did not want to see the child taken from her daughter and because the defendant felt that she had nothing to live for.

At the conclusion of the testimony, the sentencing court took the matter under advisement. One June 24, 2005, the trial court adopted the position of the State, imposed the agreed upon eight-year sentence as a Range Two Offender, and then ordered the sentence to be served in confinement. On July 20, 2005, the defendant timely filed her appeal.

## Analysis

On appeal, the defendant presents two issues for review. First, she contends that the trial court erred in overruling her motion for deferred judgment. Second and finally, she argues that the trial court erred in ordering her sentence to be served as eight years in confinement. Upon our review, we determine that the trial court was within its discretion to deny deferred judgment and to order that the defendant's sentence to be served in confinement.

I. Deferred Judgment

The deferred judgment statute allows a trial court to suspend the prosecution of an eligible defendant for a period of not less than the maximum sentence of the felony with which the person is charged. See T.C.A. § 40-35-313. To be eligible for deferred judgment, the defendant: (1) is found guilty of or pleads guilty or nolo contendere to the offense for which deferral of further proceedings is sought; (2) is not seeking deferral for a sexual offense of a Class A or Class B felony; and (3) has not previously been convicted of a felony of a Class A misdemeanor. Id. at (a)(1)(B)(I).

Deferred judgment is similar in purpose to the pretrial diversion program; the grant or denial is, therefore, discretionary with the trial court. If there is "any substantial evidence to support the refusal," the trial court's decision will be upheld and the conclusion can be overturned only if the trial court abused their discretion. State v. Kyte, 874 S.W.2d 631, 634 (Tenn. Crim. App. 1993). However, there is no presumption that a defendant who meets the prerequisites of Tennessee Code Annotated section 40-35-313(a)(1) is entitled to deferred judgment as a matter of right. The decision to grant or deny deferred judgment rests within the sound discretion of the trial court and will be overturned only after a finding of an abuse of that discretion. State v. Singleton, No. M2002-02392-CCA-R3-CD, 2004 Tenn. Crim App. LEXIS 220, at **4-5 (Tenn. Crim. App., at Nashville, Mar. 5, 2004). The court must consider the following factors in deciding whether to grant or deny deferred judgment: (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the status of the defendant's's physical and mental health; (6) the deterrence value to the defendantaccused as well as others; and (7) whether deferred judgment will serve the ends of justice. Id. at **5-6. Further, the record must reflect that the trial court has weighed all the factors in reaching its determination of whether to grant or deny deferred judgment. Id. at *6.

In the instant case, the trial court claims to have considered the requisite factors in deciding whether to grant deferred judgment; it determined that the ends of justice would not be met if the defendant was not sentenced to confinement. The trial court did not preserve its findings on the record. The trial court found that the defendant would not be a threat to society in the future, had no prior criminal history, and had no issue concerning rehabilitation, but, to justify its denial of deferred judgment or any alternative sentence, it gave great weight to the circumstances of the offense and especially to the conduct of the defendant immediately following the murder. To avoid depreciating the seriousness of the offense, the trial court deemed it necessary to sentence her to confinement. However, the court did not provide a record or proof that it properly considered the requisite factors to deny deferred judgment. In order to allow meaningful appellate review, the trial court:

> must place on the record its reasons for arriving at the final sentencing decision, identify the mitigating and enhancement factors found, state the specific facts supporting each enhancement factor found, and articulate how the mitigating and enhancement factors have been evaluated and balanced in determining the sentence.

State v. Poole, 945 S.W.2d 93, 96 (Tenn.1997) (quoting State v. Jones, 883 S.W.2d 597, 601 (Tenn.1994)).  Because the trial court did not place these findings on the record, we must review the denial of deferred judgment de novo without a presumption of correctness.

On review, we consider the following factors in deciding whether the court abused its discretion in denying deferred judgment:  (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the status of the defendant's physical and mental health; (6) the deterrence value to the defendant as well as others; and (7) whether deferred judgment will serve the ends of justice.  We review these factors in order.

The defendant has shown herself amenable to correction, which is a factor that weighs in her favor.  She has been cooperative since the time of her arrest and has been free in the community without incident since the death of her husband.

The circumstances of the offense weigh heavily against the defendant and in favor of denying deferred judgment.  The death of the victim was particularly brutal and violent.  At the time of the incident, the victim posed no physical danger to the defendant, and it appears from our review that she took steps to weaken the victim's ability to defend himself against the pending attack because he was given two "stiff" drinks prior to the homicide.  Further, the defendant's actions immediately following the homicide were, as correctly stated by the trial court, clearly an attempt to cover up what occurred in the parties' home.  The defendant has requested a sentence of probation in lieu of confinement.  This court has previously held that probation may be denied based solely upon the circumstances surrounding the offense.  State v. Bingham, 910 S.W.2d 448, 456 (Tenn. Crim. App. 1995); State v. Hartley, 818 S.W.2d 370, 373 (Tenn. Crim. App. 1991).  However, the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree; and the nature of the offense must outweigh all factors favoring probation.  Hartley, 818 S.W.2d at 374-75.

Next, we must consider the defendant's criminal record.  The record shows that the defendant did not have a prior criminal record before the underlying incident.  This factor weighs in favor of the defendant.

Next, the court must consider the defendant's social history and her mental and physical health, which are closely related and will be reviewed together.  The record contains a great deal of testimony elicited at the sentencing hearing to suggest that the defendant's social history is troubled at best.  The record reflects a history of abuse against the defendant by her father and multiple prior husbands to illustrate a less than favorable social history.  The record further shows that the defendant suffers from depression and post-traumatic stress disorder in addition to several physical ailments including emphysema, arthritis, and cluster migraines.  The defendant's family physician testified that the defendant could be incarcerated without incident if she were allowed to continue with her treatment.  The physician testified that it would not be life-threatening for the defendant to be incarcerated.  Based on the testimony at the sentencing hearing, we conclude that the defendant's

social history and mental and physical health do not preclude her from serving her sentence in confinement.

Next, we review the deterrence value of the sentence to the accused and others. The defendant is portrayed as a battered wife; however, it is important that the imposed sentence reflect the crime committed and serve as a deterrence to others so that similar crimes do not occur. The sentence must be severe enough to send a message so that similarly situated persons do not take the lives of their spouses because they are indifferent to the punishment. The punishment must serve to deter this type of behavior, and a sentence of eight years of probation with no time in confinement would not serve to deter others from committing substantially similar crimes. The supreme court in State v. Hooper, 29 S.W.3d 1, 10-12 (Tenn. 2000), established a uniform, five-part test to ensure consistency in determining whether a need for deterrence is present and whether incarceration is "particularly suited" to achieve the goal o f deterrence. The factors to consider whether a need for deterrence is present include: 1)Whether other incidents of the charged offense are increasingly present in the community, jurisdiction, or in the state as a whole; 2) Whether the defendant's crime was the result of intentional, knowing, or reckless conduct or was otherwise motivated by a desire to profit or gain from the criminal behavior; 3) Whether the defendant's crime and conviction have received substantial publicity beyond that normally expected in the typical case; 4) Whether the defendant was a member of a criminal enterprise or substantially encouraged or assisted others in achieving the criminal objective; and 5) Whether the defendant has previously engaged in criminal conduct of the same type as the offense in question, irrespective of whether such conduct resulted in previous arrests or convictions. Hooper, 29 S.W.3d at 10-12. Here, factors (1) and (2 ) are applicable and serve to support the determination that incarceration is particularly suited to achieve the goal of deterring others from committing a similar offense. Here, the defendant was responsible for the death of her allegedly abusive husband. There was a great deal of testimony during the sentencing hearing that the marriage was troubled and that the defendant was a victim of abuse in her home. Domestic abuse is a problem and is increasingly present in all parts of this state. It is important that the sentence ordered here serve as a deterrent to those similarly situated so that they do not make the decision to act in the same manner as this defendant. It is necessary that this sentence be strict enough to demonstrate to the community and the state as a whole that the penalty for killing one's spouse in this manner will be incarceration.

The next applicable factor from Hooper is whether the defendant's crime was the result of intentional, knowing, or reckless conduct. Actions that are the result of intentional, knowing, or reckless behavior are probably more deterrable than those which are not the result of a conscious effort to break the law. Id. "Common sense tells us that we may have less ability to deter crimes that are the result of provocation, sudden and extreme passion, or even negligent behavior, irrespective of whether others who commit similar crimes are incarcerated or given probation." Id. The facts in this case reveal that the death of the victim was brought about by intentional and calculated means. The defendant and her daughter set out to impair the defendant by intoxication and then assaulted and killed him. These actions were intentional and knowing, and there is a need to deter this type of activity within our state. Any sentence less than confinement would fail to effectively deter

-8-

similar situations. We conclude that the sentence imposed accomplishes the need to deter the defendant and others from repeating this type of behavior.

Finally, we must consider whether deferred judgment will serve the ends of justice. As previously stated, the actions of the defendant after the homicide occurred are especially troubling. After the defendant committed the homicide, she took great steps to cover up what occurred in the home and went as far as to attempt to burn the victim in his truck. It is clear that the victim was treated with exceptional cruelty and, therefore, a sentence of deferred judgment does not necessarily serve the ends of justice. The defendant was responsible for the death of her husband. She made herself his judge, jury, and executioner above the law and sentenced him to death. The defendant was already granted a great deal of consideration when the State offered a substantially mitigated offer of a plea of reckless homicide instead of murder. It would not serve the ends of justice for the defendant, after murdering her husband, to serve her sentence on probation with no incarceration.

Typically, the record must reflect that the trial court has weighed all of the factors in reaching its determination. State v. Bonestel, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). The statute contemplates that trial courts explain on the record why a defendant does not qualify under its analysis and, when factors suggesting denial outweigh the factors favorable to the grant of judicial diversion, it is the duty of the trial court to explain on the record. Here, because the trial court failed to articulate on the record their balancing of the factors, we are forced to conduct our own review. In this instance, the factors of the defendant's amenability to correction and her lack of a criminal record weigh in her favor toward deferred judgment. The factors that weigh against the defendant are: 1) the circumstances of the offense; 2) her social history; 3) the status of her physical and mental health; 4) the deterrence value to her as well as to others; and 5) whether deferred judgment will serve the ends of justice. As previously stated, the factor of the circumstances of the offense may, standing alone, outweigh all other factors. For the circumstances of the offense as committed to outweigh all other factors, the offense must be especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors favoring probation. Hartley, 818 S.W.2d at 374-75. We conclude that in this instance, the circumstances of the offense outweigh any and all factors favoring probation. The killing was especially violent, horrifying, shocking, reprehensible, offensive, and of an excessive degree for the offense of reckless homicide. The defendant left the room in which she and her husband had been arguing, retrieved the weapon, and brutally killed her spouse. She bludgeoned him with a lead weight and then, to ensure that he would die, strangled him. We conclude that the circumstances of this offense meet the standard as set forth in Hartley and justify a denial of probation and any other alternative sentence. Despite the fact that the trial court did not put each factor on the record, we conclude that it did not abuse its discretion in denying deferred judgment based on our review.

II. Sentencing

The burden is upon the appealing party to show that the sentence is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210(b), to consider the following factors in sentencing:

(1)[t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3)[t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5)[e]vidence and information offered by the parties on the enhancements and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

In determining if incarceration is appropriate, a trial court should consider the need to protect society by restraining a defendant having a long history of criminal conduct, the need to avoid depreciating the seriousness of the offense, whether confinement is particularly appropriate to effectively deter others likely to commit similar offenses, and whether less restrictive measures have often or recently been unsuccessfully applied to the defendant. T.C.A. § 40-35-103(1). See also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

Under the Criminal Sentencing Reform Act of 1989, trial judges are encouraged to use alternatives to incarceration. An especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. T.C.A. § 40-35-102(6). However, this presumption is not available to a defendant who commits the most severe offenses, has a criminal history showing clear disregard for the laws and morals of society, and has failed past efforts at rehabilitation. Id. at 40-35-102(5); State v. Fields, 40 S.W.3d 435, 440 (Tenn. 2001). The court should also examine the defendant's potential for rehabilitation or lack thereof when considering whether alternative sentencing is appropriate. T.C.A. § 40-35-103(5). Sentencing issues must be decided in light of the unique facts and circumstances of each case. See State v. Taylor, 744 S.W.2d 919, 922 (Tenn. Crim. App. 1987).

Initially, we note that the absence of a criminal record for the defendant weighs in her favor in ordering an alternative sentence. However, the absence of a criminal record is not enough to outweigh the other factors in favor of a sentence in confinement. This court has consistently held that the proper sentence for a defendant who commits a serious offense, even without a history of criminal conduct, can be incarceration. See State v. Sandy Marie McKay, No. M2002-03066-CCA-R3-CD, 2004 Tenn. Crim. App. LEXIS 238 (Tenn. Crim. App. Mar. 12, 2004, at Nashville) (where the court deemed incarceration was the appropriate manner of service of a defendant that did not have a long history of criminal conduct but where her offense, attempted aggravated child neglect, was very serious). See also State v. Marian Esther Cox, No. E2002-01177-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 555 (Tenn. Crim. App. June 23, 2003, at Knoxville) (where the defendant appealed her sentence of confinement for committing arson but the court deemed confinement necessary to avoid depreciating the seriousness of the offense). In the instant case, the defendant

does not have a long history of criminal conduct; however, we view the defendant's offense as very serious. We have here a situation where a life was taken through what we believe were calculated and brutal means. The defendant bludgeoned the victim to the point of unconsciousness, yet the trauma to the head was not enough to kill him. Realizing that the victim was still breathing, the defendant climbed on top of him and choked the last breaths of life from his lungs. This clearly qualifies as a very serious offense and outweighs the other factors to be considered under Tennessee Code Annotated section 40-35-103. In sum, we deem incarceration as the appropriate manner of service of the defendant's sentence for this conviction. It would substantially depreciate the seriousness of the offense to order any alternative sentence to incarceration. Further, an alternative sentence would not serve to deter others from committing a similar offense.

The trial court also pointed out several facts that further weaken the defendant's case for alternative sentencing. Particularly, the court noted, and we agree, that the defendant ignored the law, took action on her own, and committed a most severe offense, the brutal death of her husband. Further, she took steps to conceal her actions and lied to law enforcement during their investigation in order to protect herself. The defendant has been greatly benefitted by entering a plea to the lesser offense of reckless homicide. The court specifically found that confinement was necessary to avoid depreciating the seriousness of the offense. We conclude that the trial court appropriately analyzed the particular facts of this case, and we agree with the trial court's reasoning and its finding that the defendant is not an appropriate candidate for alternative sentencing.

Finally, we note that though the defendant was technically a Range I offender, she pled guilty as a Range II offender which removes her from the presumption of entitlement to an alternative sentence. The defendant agreed to be sentenced as a Range II offender and therefore waived the presumption of entitlement to an alternative sentence. Our supreme court has held that a hybrid plea, knowingly and voluntarily entered, "waives any irregularity as to offender classification or release eligibility." See Hicks v. State, 945 S.W.2d 706, 709 (Tenn. 1997). We conclude that the defendant failed to carry her burden of showing that the trial court's sentence was improper.

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-11-